Opinion issued May 3, 2012.



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-11-00403-CR

———————————

Willard K. Webb, Appellant

V.

The State of
Texas, Appellee



 



 

On Appeal from the 179th District Court 

Harris County, Texas



Trial Court Case No. 1278106

 



 

MEMORANDUM OPINION

A jury convicted
Willard Webb of murder and found he had used a deadly weapon during the
commission of the murder.  See Tex.
Penal Code Ann. § 19.02(b)
(West 2003).  The trial
court assessed punishment at forty-five years’ confinement.  On appeal, Webb contends that (1) the trial
court erred in failing to instruct the jury to apply the accomplice witness
rule to three persons that he contends are accomplice witnesses, (2) the
evidence is insufficient to corroborate accomplice testimony and the evidence
is legally insufficient to support the verdict, and (3) the trial court erred
in denying Webb’s motion for a mistrial after the jury heard portions of a tape
recording in which Webb invoked his Fifth Amendment right against
self-incrimination.  We conclude that the
trial court properly refused to instruct the jury to apply the accomplice
witness rule to persons who were either not accomplices or not trial witnesses,
the evidence supports the conviction, and the trial court did not err in
denying Webb’s motion for a mistrial.  We
therefore affirm.

BACKGROUND

          Michael,
Mark, and Melvin Cupp are brothers, who together
began stealing ATMs in 2008.  They
removed ATM machines with a forklift, emptied the contents of the machines, and
discarded them.  The Cupps
paid non-family members to assist; Webb was one such recruit.  At first, Webb drove trucks containing the
stolen ATMs, but the Cupps later “promoted” him to
operate the forklift.  Driving the
forklift was considered a more senior position. 
Webb in turn recruited Leandro Sanchez, the complainant, to join the Cupp’s theft operation; he was a truck driver. 

Shortly after Sanchez joined the
group, the Cupp brothers and Webb became upset with
Sanchez because they overheard him discussing a pending theft with his
ex-girlfriend.  Nevertheless, Sanchez
continued to participate, and was caught and arrested for stealing an ATM
machine. Webb and the Cupp brothers posted bond on
Sanchez’s behalf and Sanchez continued to participate in ATM thefts.  

According to Webb’s accomplice and
girlfriend, Patricia Copes, Webb had criticized Sanchez’s contributions to the
theft ring after Sanchez was arrested. 
Webb was responsible for paying Sanchez his share of the theft proceeds
but had started to withhold payment. 
Despite this friction, Sanchez moved in with Copes and Webb in January
2009.  During the time that Webb, Copes, and Sanchez had lived together, Copes observed
Sanchez consume Seroquel, an antipsychotic prescription drug, and alcohol;
Seroquel had a “druggy” effect on Sanchez. 


On the day of the murder, Webb told
Copes that he was going to kill Sanchez, but Copes testified that she had not
taken him seriously because he “was always talking about killing people.”  That evening, Copes, Webb, and Sanchez
attended a Valentine’s Day party at Michael Cupp’s
house. 

At the party, Webb approached Copes,
carrying Seroquel pills. He asked Copes to crush the pills with a spoon; Copes
found this unusual, but she did as she was told.  She placed the crushed pills in a cup, took
them into the kitchen, and left them on a shelf.  Webb later told Copes that he had served
Sanchez shots of alcohol laced with the crushed Seroquel pills. 

Around 10:00 that evening, Michael Cupp, Webb, and Sanchez left the party in Michael’s dark
blue Cadillac Escalade.  When they left,
Webb held Sanchez upright, because he was unsteady on his feet.  

Michael Cupp
and Webb returned to the party approximately forty-five minutes later—without Sanchez.  Webb and Copes then left the party.  During their drive home, Webb told Copes: “I
killed him.  I killed him.”  Webb drove across the Interstate 10 San Jacinto
Bridge, which was not in the direction of their home.  He observed that the police had arrived
quickly to the scene.  Neither Copes nor Webb stopped to approach the emergency personnel
on the bridge. 

Webb recounted to Copes what had
happened: Webb and Michael Cupp covered up Michael Cupp’s Escalade plates with duct tape.  Together, they left the party with Sanchez in
the Escalade.  Michael stopped the car on
the San Jacinto Bridge.  He ordered Webb
to “Get out and do it.”  Webb grabbed
Sanchez’s legs and flipped Sanchez over the railing of the bridge into the
water. 

Shortly after midnight on the night
of the murder, Melvin Cupp picked up Webb and Copes
from their house.  Melvin testified that
he had not attended the Valentine’s Day party. 
He was asleep at home when Michael Cupp
called.  Michael asked Melvin to pick up
Webb and drive Webb to a nearby gas station. 
At the station, Melvin met with Michael and Webb.  During their meeting, Michael told Melvin
that Webb had thrown Sanchez off of the bridge; Webb remained silent and did
not contest Michael’s statement. 

The following day, Melvin again met
with Webb and Michael.  Webb told Melvin
that he had tried to poison Sanchez at the party with some pills.  He later flipped Sanchez over the railing of
the bridge after Sanchez had stumbled out of the Escalade.  According to Melvin, Webb stated that he had
thrown Sanchez over the railing because Webb was “tired of taking care of
[Sanchez].”  Melvin acknowledged that the
State had charged him for the ATM thefts; he testified that he had received
nothing in exchange for his testimony against Webb. 

On their way home from dinner at Red
Lobster, a married couple witnessed a man throw another man off of the San
Jacinto Bridge.  Michael Alvarez and his
wife drove westbound across the San Jacinto Bridge on Interstate 10.  As the Alvarezes
proceeded across the bridge, traffic slowed. 
They noticed an apparently stalled Cadillac Escalade on the westbound
shoulder of the bridge.  Two men stood
outside of the car; one was leaning on the railing of the bridge.  The second man suddenly bent down, “hooked”
the legs of the man leaning over the railing, and tossed the man off the
bridge.  It did not appear to be an
accident.  The second man got into the
Escalade, and the car drove off.  The
couple followed the Escalade from the bridge and attempted to read its license
plate, but could not because someone had covered the plate with duct tape. They
reported the incident to the police.

Eight days later, police recovered
Sanchez’s body from the San Jacinto River. 
Hair and tissue samples taken from the wooden pylons supporting the San
Jacinto Bridge on Interstate 10 matched DNA taken from Sanchez’s body.  A crime scene investigator testified that,
given the presence of DNA on the pylons, the trajectory of Sanchez’s fall was
consistent with having been pushed off the bridge. 

The medical examiner concluded that
Sanchez’s death was a homicide, based upon the police report and witness
statements.  Sanchez had a fractured
skull, sternum, ribs, and leg.  The
medical examiner testified that these injuries were consistent with striking
the wooden pylons below the San Jacinto Bridge. 
The medical examiner concluded that Sanchez’s cause of death was
drowning.  According to the medical
examiner, pushing a person off of the bridge would be a deadly act, clearly
dangerous to human life.  As part of the
autopsy, the medical examiner ordered a toxicology screen.  Testing revealed that, at the time of his
death, Sanchez had between .18 and .27 alcohol concentration as well as cocaine
and Seroquel in his body.  On
cross-examination, the medical examiner conceded that the
injures that he had observed could have been caused by striking a boat
propeller. 

The State also introduced a letter
written by Webb and a tape recording of a conversation between Webb and Michael
Cupp’s half brother,
Chris.  In the letter, Webb wrote to
Copes, “Trish, as long as me and you stick to our alibis . . . , we
are good.”  The State introduced a
redacted form of the recorded conversation between Webb and Chris Cupp and a transcript of the recording.  The recording and transcript included statements
by Webb disclosing his criminal history and a statement that Webb had been
arrested and had invoked his right to counsel. 
After the tape had played, defense counsel objected and moved for a
mistrial.  The trial court denied the
motion, but redacted the contested comments from the juror’s transcripts.  

The trial court charged the jury to
treat Patricia Copes as an accomplice witness and instructed the jury on the
accomplice-witness rule:

The
witness, Patricia Copes, is an accomplice, if an offense was committed, and you
cannot convict the defendant upon her testimony unless you further believe that
there is other evidence in the case, outside of the testimony of Patricia
Copes[,] tending to connect the defendant with the offense committed . . . .

 

Webb requested that the trial court instruct the
jurors to also treat Michael, Melvin, and Chris Cupp
as accomplice witnesses, but the trial court declined to do so.  

I.              
The Accomplice Witness Rule

Webb contends that the trial court
erred in instructing the jury on the accomplice witness rule and that there is
insufficient evidence to corroborate the accomplice testimony proffered at
trial.  Before turning to sufficiency, we
discuss the accomplice witness rule and its effect on the state of the evidence
and the jury charge.  

Under Texas Code of Criminal
Procedure article 38.14, a conviction cannot stand on an accomplice witness’s
testimony unless the testimony is corroborated by other, non-accomplice
evidence that tends to connect the accused to the offense. See Tex. Code
Crim. Proc. Ann. art 38.14 (West 2005).  An accomplice is a person who participates in
the offense before, during, or after its commission with the requisite mental
state.  Druery v. State, 225 S.W.3d
491, 498 (Tex. Crim. App. 2007).  Presence
at the crime scene alone does not make a person an accomplice; an
accomplice must have engaged in an affirmative act that promotes the commission
of the offense that the accused committed.  Smith v.
State, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011) (citing Kunkle v. State, 771 S.W.2d 435, 439
(Tex. Crim. App. 1986)).  

Witnesses may be accomplices as a
matter of law or as a matter of fact.  Id. 
A witness who is indicted for the same offense or a lesser-included
offense as the accused is an accomplice as a matter of law, and the trial court
must instruct the jury accordingly.  Id.  If conflicting evidence of the witness’s role
in the offense exists, then the trial judge may instruct the jury to determine
a witness’s status as a fact issue.  Smith, 332 S.W.3d at
439–40.  But if the evidence
clearly shows that a witness is not an accomplice, the trial judge is not
obliged to instruct the jury on the accomplice witness rule.  Id. at 440.

We review a claim of jury-charge
error using the procedure set out in Almanza v. State,
686 S.W.2d 157 (Tex. Crim. App. 1984). First, we determine whether there is
error in the charge.  Ngo v. State, 175 S.W.3d 738, 743 (Tex. Crim.
App. 2005) (citing Middleton v. State,
125 S.W.3d 450, 453 (Tex. Crim. App. 2003)). 
If error exists and the appellant objected to the error at trial,
reversal is required if the error “is calculated to injure the rights of the
defendant,” in other words, if there is “some harm.”  Almanza, 686 S.W.2d at 171.  We look to the actual degree of harm in light
of the entire jury charge, the state of the evidence, including the contested
issues and weight of probative evidence, the argument of counsel, and any other
relevant information revealed by the record of the trial as a whole.  Id.  

Webb objects to the jury charge
because, although the charge instructed the jury on the accomplice witness rule
and instructed the jury to apply the rule to Patricia Copes’s
testimony, the charge did not instruct the jury to apply the rule to the Cupp brothers.  Webb
contends that the judge was obligated to include the three brothers as
accomplices—as a
matter of law or fact.  Webb also
contends that the charge fails to instruct the jury that an accomplice
witness’s testimony must be corroborated by non-accomplice evidence connecting
the accused to the crime, because the charge instructed the jury that
non-accomplice evidence was required to corroborate only Copes’s
testimony.

A.  
Definition of Accomplice Witness

To be an accomplice to a crime, “the witness’s participation
with the defendant must have involved some affirmative act that promotes the
commission of the offense with which the defendant is charged.”  Druery, 225 S.W.3d at 498.  A witness is not an accomplice merely because
he knew about the offense and did not disclose it, or even if he concealed it.  Id.  Important to this case, complicity with the accused in the commission of an offense different
from the charged offense does not make that witness an accomplice witness.  Id.  “[I]f the witness cannot be prosecuted for
the offense with which the defendant is charged, or a lesser-included offense
of that charge, [then] the witness is not an accomplice witness as a matter of
law.”  Id.

Michael Cupp did not testify at
trial.  Although the evidence raises the
issue of his complicity, he was not a trial witness.  Therefore, the trial court properly refused
the instruction for Michael Cupp, because the rule
only applies to accomplice witnesses who testify.  See
Paredes v. State, 129 S.W.3d 530, 537 (Tex.
Crim. App. 2004) (accomplice witness instruction applies only to accomplices
who are called as witnesses).  

In contrast, the State called Melvin and Chris Cupp to testify during its case‑in-chief.  The record reveals that Melvin was not present
during the murder; Melvin learned of the murder after its completion.  While Melvin did not disclose the murder, the
mere fact that he did not disclose it does not make him an accomplice.  See Druery, 225 S.W.3d at 498.  Because Melvin had not been indicted for the
murder or a lesser‑included offense of Sanchez’s murder, and the evidence
does not show that Melvin could have been so charged, he is not an accomplice
as a matter of law.  Chris Cupp is not an accomplice for similar reasons.  He was not involved or alleged to have been
involved in the murder or the theft ring. 
Nor does the fact that Melvin and Chris may have participated with Webb
in the ATM thefts—none of which happened in connection with the murder—make them accomplices to this
murder.  See id.  

We hold that the trial court properly refused the instruction
for Melvin and Chris Cupp because, as a matter of
law, neither was an accomplice to Sanchez’s murder.  Accordingly, the trial court properly charged
the jury on the accomplice witness rule and on its application to Patricia Copes’s testimony.

II.           
Evidentiary Sufficiency

A.  
Corroborating Evidence

Webb maintains that there is insufficient evidence to corroborate the accomplice
testimony proffered at trial.  The test to weigh the sufficiency of corroborating
evidence is to eliminate the accomplice witness’s testimony and then to examine
the other evidence to determine if there is evidence tending to connect the
defendant with the offense.  Solomon v. State, 49 S.W.3d 356, 361
(Tex. Crim. App. 2001); Longoria v. State,
154 S.W.3d 747, 758 (Tex. App.—Houston [14th Dist.] 2004, pet. ref’d).  The evidence
need not be sufficient by itself to establish guilt, nor must it directly connect
the accused to the offense.  Cathey v. State, 992.
S.W.2d 460, 462 (Tex. Crim. App. 1999) (en banc) (recognizing different
standard of review for corroborating evidence than legal sufficiency because
accomplice witness rule is imposed by statute).   Rather, the evidence “need only tend to
connect” the accused to the offense.  Id.  No
specific quantum of evidence is required to corroborate accomplice testimony.  Dowthitt v. State, 931 S.W.2d 244, 249 (Tex. Crim.
App. 1996).  We view the
corroborating evidence in the light most favorable to the jury’s verdict.  Gill v.
State, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994).

According to Melvin Cupp, Webb
told him that he had attempted to poison Sanchez at the party by giving him
some pills, and the toxicology screen confirms that Sanchez had Seroquel in his
body at the time of his death.  Melvin also
recalled that his brother Michael told him that Webb threw Sanchez off the
bridge after they left the party. 
Although Webb was present when Michael told Melvin what Webb had done,
Webb said nothing.  Paredes, 129 S.W.3d at 535 (recognizing
silence as adoptive admission by party opponent); see also Tex. R. Evid. 801(e)(2)(B).  

Eyewitness testimony from Michael Alvarez confirms that a
man was thrown off the San Jacinto Bridge on Valentine’s Day.  He and his wife saw two men on the shoulder
of the bridge; one man suddenly threw the other off the bridge.  The Alvarezes gave
chase, but were unable to read the car’s license plates because someone had covered
them with duct tape.  See Miller v. State, 177 S.W.3d 177, 184
(Tex. App.—Houston [1st Dist.] 2005, pet. ref’d)
(flight immediately after shooting and attempts to hide evidence is
circumstantial evidence of guilt). 

Webb contends that the non-accomplice evidence is
insufficient to corroborate Copes’s testimony.  However, non-accomplice witnesses—Melvin Cupp and Michael Alvarez—tend to connect Webb to the
offense, and physical evidence also corroborates Copes’s
testimony.  Based on the forgoing, we
hold that the record contains sufficient non-accomplice evidence to corroborate
Copes’s testimony. 
Having concluded that sufficient evidence corroborates Copes’s testimony, we turn to the sufficiency of the
evidence supporting the conviction.  

B.  
 Legal
Sufficiency

We review all evidentiary sufficiency
challenges under the same standard.  See Brooks v. State, 323 S.W.3d 893, 895
(Tex. Crim. App. 2010) (“[T]he Jackson v.
Virginia legal sufficiency standard is the only standard that a reviewing
court should apply in determining whether the evidence is sufficient to support
each element of a criminal offense that the State is required to prove beyond a
reasonable doubt.”) (referring to Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781(1979)).  Under this standard, evidence is insufficient
to support a conviction if, considering all the record evidence in the light
most favorable to the verdict, no rational fact finder could have found that
each essential element of the charged offense was proven beyond a reasonable
doubt. 
See Jackson, 443 U.S. at 319, 99 S. Ct. at 2789; In re Winship,
397 U.S. 358, 361, 90 S. Ct. 1068, 1071, 25 L. Ed. 2d 368 (1970); Laster v. State, 275 S.W.3d 512, 517 (Tex.
Crim. App. 2009); Williams v. State,
235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

Viewed in the light most favorable to
the verdict, the evidence is insufficient when either: (1) the record contains
no evidence, or merely a “modicum” of evidence, probative of an element of the
offense; or (2) the evidence conclusively establishes a reasonable doubt. See Jackson, 443 U.S. at 314, 319 n. 11,
320, 99 S. Ct. 2781; Laster,
275 S.W.3d at 518; Williams, 235
S.W.3d at 750.  This standard applies
equally to both direct and circumstantial evidence. King v. State, 895 S.W.2d 701, 703 (Tex.
Crim. App. 1995).

We do not weigh any evidence or
evaluate the credibility of any witnesses, as this was the function of the fact
finder.  Williams, 235 S.W.3d at 750.  Instead, we determine whether both the
explicit and implicit findings of the fact finder are rational by viewing all
the evidence admitted at trial in the light most favorable to the verdict and
resolving any inconsistencies in the evidence in favor of the verdict.  Adelman v. State, 828 S.W.2d 418, 422 (Tex. Crim. App. 1992).

1.   
Intent and Identification 

A person commits murder by
intentionally or knowingly causing the death of an individual or by intending
to cause serious bodily injury and committing an act clearly dangerous to human
life that causes the death of an individual. 
See Tex. Penal Code Ann. § 19.02(b)(1)(2).  Webb contends that the evidence legally
insufficient to support a finding that he intended to cause Sanchez’s death and
to identify him as perpetrator of the crime. 


The jury in this case heard direct
evidence of Webb’s involvement from Copes and Melvin Cupp.  Webb confessed to both of them that he killed
Sanchez by throwing him off the bridge. 
Before Sanchez’s death, Webb also revealed to both that he had wanted to
kill Sanchez, which supports the jury’s implied finding of premeditation.

The jury also heard circumstantial
evidence of Webb’s guilt.  In a letter to
Copes, Webb asked Copes to “stick to our alibis.”  Wiggins v. State, No. 01‑07‑00672-CR, 2009 WL
2231806, at *5 (Tex. App.—Houston [1st Dist.] July 23, 2009, pet ref’d) (statement that appellant was going to “stick to his
story” as circumstantial evidence of guilt). 
Michael Avlarez testified that he and his wife
witnessed a man thrown from the bridge.  
The man who flipped the other man off of the bridge did not seek help
from other drivers, but quickly left the scene in a dark blue Escalade—the same
model and color car owned by Michael Cupp.  See
Guevara v. State, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (defendant’s
suspicious behavior following murder as a circumstance of guilt); Hinojosa v. State, 4 S.W.3d 240, 253
(Tex. Crim. App. 1999) (same).  The Alverzes followed the car, but could not read the car’s
license plates, because someone had covered the plates with duct tape.  See Miller, 177 S.W.3d at 184 (attempts to hide evidence as
circumstance showing guilt).

The medical examiner concluded that
Sanchez’s death was a homicide, listing the cause as drowning.  According to forensic evidence collected from
the scene, Sanchez hit the bridge pylons as he fell into the river.  The trajectory of Sanchez’s fall indicated
that he had been pushed off of the bridge. 
In light of evidence that Sanchez was thrown from the bridge and struck
the pylons, the examiner determined that Sanchez likely had been
unconscious and unable to swim when he hit the water.  The examiner concluded that throwing a person
from a bridge was a deadly act clearly dangerous to human life.  

Viewing the evidence in the light most
favorable to the verdict, the evidence reveals that Webb intentionally or
knowingly caused Sanchez’s death or intended to cause serious bodily injury to
Sanchez by throwing him from a bridge, an act clearly dangerous to human life
that caused Sanchez’s death.  We
therefore conclude that the evidence is legally sufficient to support finding
beyond a reasonable doubt that Webb murdered Sanchez.   

2.   
Deadly Weapon Finding

          The charge
asked the jury to find whether Webb used or exhibited a deadly weapon, namely his
arm, hand, or water, during the commission of the offense or during the
immediate flight therefrom.  The
definition of “deadly weapon” provided to the jury tracks the Penal Code
definition of “deadly weapon”: “anything manifestly designed, made, or
adapted for the purpose of inflicting death or serious bodily injury; or
anything that in the manner of its use or intended use is capable of causing
death or serious bodily injury.”  Tex. Penal Code Ann. § 1.07(a)(17)(A), (B) (West 2006).  Hands, arms, and water are not deadly weapons
per se, but they may be deadly weapons within the definition of the Penal Code
“depending upon the evidence shown.”  See Lane
v. State, 151 S.W.3d 188, 191 (Tex. Crim. App. 2004) (quoting Turner v. State, 664 S.W.2d 86, 90 (Tex.
Crim. App. 1983)) (observing that arms and hands are not deadly weapons but may
be depending on evidence shown).  

The medical examiner and a police
investigator testified about Webb’s use of hands, arms, and water as deadly
weapons.  Both testified that, in this
case, water could be used as a deadly weapon if the victim had been unable to
swim because he was unconscious.  They
testified that, given the presence of Sanchez’s DNA on the pylons, Sanchez had
likely struck the pylons and been rendered unable to swim after the fall.  They concluded that, if Sanchez had been
unable to swim, then the water could have been capable of causing his
death.  The medical examiner also
testified that hands or arms could be used as a deadly weapon when used to
throw someone from a bridge—an act clearly dangerous to human life.  

This evidence supports a finding that
appellant used his hands, arms, or water as a deadly weapon.  See
Turner, 664 S.W.2d at  90 (observing
that evidence such as autopsy report, types of injuries inflicted, the manner
that hands were used and the size and condition of the hands are types of
evidence that may be considered in determining whether hands were deadly
weapon).  Accordingly, we hold that there
is legally sufficient evidence to support the jury’s finding that Webb used a
deadly weapon during the commission of the offense, namely his hands, arms, or
water.

III.        
Evidentiary Challenge

Webb contends that the trial court
erred in overruling his motion for a mistrial after the jury heard an audio
tape in which Webb stated that he had invoked his Miranda rights.  We review a
trial court’s denial of a motion for a mistrial for an abuse of discretion.  Ocon v. State, 284 S.W.3d 880, 884 (Tex. Crim.
App. 2009).  We view the evidence
in the light most favorable to the trial court’s ruling, considering only those
arguments before the court at the time of its ruling.  Wead v. State, 129 S.W.3d 126, 129 (Tex. Crim.
App. 2004).  We uphold the ruling
if it was within the zone of reasonable disagreement.  Id.

A mistrial is an appropriate remedy in
extreme circumstances for a narrow class of highly prejudicial and incurable
errors.  Hawkins v. State, 135 S.W.3d 72, 77
(Tex. Crim. App. 2004); Wood v. State,
18 S.W.3d 642, 648 (Tex. Crim. App. 2000).  A mistrial is required only when the
impropriety is “clearly prejudicial to the defendant and is of such character
as to suggest the impossibility of withdrawing the impression produced in the
minds of the jurors.”  Ladd v. State, 3 S.W.3d 547, 567 (Tex.
Crim. App. 1999).  Because a
mistrial is an extreme remedy, a trial court should grant it “only when residual
prejudice remains” after less drastic alternatives are explored.  Barnett
v. State, 161 S.W.3d 128, 134 (Tex. App.—Fort Worth 2005).  A motion for mistrial must be made as soon as
the grounds for it become apparent.  Griggs v. State, 213
S.W.3d 923, 927 (Tex. Crim. App. 2007). 
If a party delays his motion for mistrial by failing to timely object to
objectionable testimony, he has failed to preserve his complaint for appellate
review.  See Tex. R. App. P. 33.1;
Griggs, 213 S.W.3d
at 927.

At trial, the state introduced a tape
recording of a conversation between Webb and Chris Cupp.  Webb did not object to the state’s proffer of
the tape into evidence.  The state then
played the audio tape before the jury.  
Webb objected to the audio tape at trial after it was played and
requested a mistrial on the basis that the tape contained statements by Webb
that he had invoked his Miranda
rights upon police questioning.  The
trial court denied the motion and asked counsel whether he would like the court
to instruct the jury to disregard the contested statements.  Counsel denied a limiting instruction, and
the parties redacted the contested statements from the juror’s transcripts of
the recording.   

To preserve a complaint for appellate
review, a party must present the trial court with a timely request, objection,
or motion stating specific grounds for the ruling sought.  Tex.
R. App. P. 33.1(a); Menard v.
State, 193 S.W.3d 55, 59 (Tex. App.—Houston [1st Dist.] 2006, pet. ref’d) (“To be timely, an objection must be raised at the
earliest opportunity or as soon as the ground of objection becomes apparent.”
(quoting Penry v. State, 903 S.W.2d 715, 763 (Tex. Crim.
App. 1995))).  Webb did not object to the
tape when it was offered into evidence but objected to it only after the tape
was played before the jury.  Webb had
received a transcript of the tape from the state in advance of trial and could
have object to its contents earlier. 
Because Webb objected to the evidence after the jury heard the tape, the
objection was untimely.  See Tex.
R. Evid. 103(a); see also Tex. R. App. P.
33.1; see e.g., Gillenwaters
v. State, 205 S.W.3d 534, 537 (Tex. Crim. App. 2006) (objection timely if
made at earliest opportunity possible), McLean
v. State, 312 S.W.3d 912, 915 (Tex. App.—Houston [1st Dist.] 2010, no pet.)
(same).  It
therefore preserved nothing for review.  See Tex.
R. App. P. 33.1.  Thus, the trial
court did not err in denying Webb’s motion for a mistrial.  

CONCLUSION

We affirm the judgment of the trial
court.

 

 

                                                                      Jane
Bland

                                                                      Justice


 

Panel
consists of Justices Keyes, Bland, and Sharp.

Do
not publish.   Tex. R.
App. P. 47.2(b).